**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


Solar Utilities Network, L.L.C,

        Plaintiff,

vs.

Navopache Electric Cooperative, Inc.,

        Defendant.

No. CV-12-08095-PCT-PGR

<u>ORDER</u>

      Pending before the Court is defendant Navopache Electric Cooperative, Inc.'s Motion for Summary Judgment Pursuant to Rule 56 (Doc. 72), which the Court finds should be denied.  Also pending are three related procedural motions: Navopache Electric Cooperative, Inc.'s Motion to Exclude James Dudley Howard, Jr. as a Witness (Doc. 71), which the Court finds should be denied; plaintiff Solar Utilities Network. LLC's Motion to Strike Defendant Navopache Electric Cooperative, Inc.'s Improper Controverting Statement to Sun's Supplemental Statement of Facts (Doc. 85), which the Court finds should be granted; and Navopache Electric Cooperative, Inc.'s Alternative Motion for Leave to File Amended Reply (Doc. 86), which the Court

1   finds should be denied.[1]

2   <u>Background</u>

3       According to the Second Amended Complaint ("SAC") (Doc. 35), this diversity-

4   based action arises out defendant Navopache Electric Cooperative, Inc. ("NEC")'s

5   alleged wrongful repudiation and termination of the parties' Solar Energy Power

6   Purchase Agreement ("PPA") dated October 15, 2010.  The purpose of the PPA was

7   to assist NEC in complying with requirements of the Arizona Corporation

8   Commission that it obtain certain amounts of its electricity from renewable energy

9   sources.  Pursuant to the PPA, NEC agreed to purchase for twenty years all of the

10  electric energy and related environmental benefits produced at or attributable to a

11  one megawatt solar power plant that plaintiff Solar Utilities Networks, LLC ("SUN")

12  was to construct and operate in Hunt Valley, Arizona.  In a letter to SUN dated

13  August 4, 2011, NEC terminated the PPA and repudiated its contractual obligations

14  "due to SUN's failure to commence construction of the Generation Facility and to

15  secure Construction Financing by July 31, 2011."  The SAC alleges state law claims

16  for Breach of Contract (First Claim for Relief) and for Breach of the Implied Covenant

17  of Good Faith and Fair Dealing (Second Claim for Relief), both arising from the

18  termination of the PPA.  The PPA provides that it is to be governed and construed

19  in accordance with Arizona law.

---

[1]

    While the parties have requested oral argument, the Court concludes
that oral argument would not significantly aid the decisional process. *See* <u>Partridge
v. Reich</u>, 141 F.3d 920, 926 (9th Cir.1998).
    The Court notes that it has intentionally not discussed every argument raised
by the parties and that those arguments not discussed are considered by the Court
to be unnecessary to its resolution of the pending motions.

- 2 -

NEC's Motion to Exclude Testimony of James Howard

NEC has moved to preclude James Howard from being either an expert or fact witness and to exclude SUN from offering Howard's opinions, reports or testimony in this action.

The Court considers the following facts to be undisputed for the purposes of this motion. In January 2011, after the execution of the PPA, SUN partnered with Dudley Ventures ("DV"), an investment and advisory services firm that specializes in utilizing congressionally-sanctioned tax credits and other complex federal and state subsidy programs. DV is involved in numerous investments regarding power generation facilities, including solar plants. SUN turned the solar power plant project over to DV to obtain financing and to manage the construction and operation of the solar plant. DV ultimately became a joint venture partner with SUN and the manager of the project. Under the joint venture agreement between SUN and DV, DV is contributing 50% of the attorney fees and legal costs of this action and is to receive 50% of any damages recovered in this action. James Howard is the founder and CEO of DV and is a 75% owner of the company. SUN views Howard as likely its most important witness in this action as he was intimately involved with almost all of the operative issues involved in this action, including DV's efforts to obtain construction financing, to commence construction of the power plant, to obtain tax benefits and subsidies, the efforts to obtain NEC's audited financial statements, the time line for completion of the project, and the events occurring after NEC terminated the PPA. Howard's involvement in this action also included choosing the litigation counsel for SUN.

Since Arizona law supplies the rule of decision in this action, Arizona law governs Howard's competency as a witness. Fed.R.Evid. 601. NEC argues that

Howard cannot be allowed to be a witness because Arizona law prohibits the presentation of evidence from a witness whose compensation is based on the outcome of the litigation. *See* Laos v. Soble, 503 P.2d 978, 979 (Ariz.App.1972) ("We are of the opinion, and so hold, that a contract providing for compensation of a witness contingent on the success of the litigation is subversive of public justice for the reason that his evidence may be improperly influenced.   Public policy considerations brand such [a] contract illegal.")[2] NEC reasons that Howard's testimony as a witness is improper because he stands to receive contingent compensation inasmuch as his company, DV, stands to receive 50% of any damages awarded to SUN. SUN alleges in its SAC that its damages from NEC's allegedly wrongful termination of the PPA exceed $7,000,000.

While the Court agrees with NEC that Howard, as the majority owner of DV, has a financial interest in this action given that he may personally profit if SUN wins, the Court cannot agree that under the particular facts at issue that Arizona public policy absolutely forbids him from testifying.  First, Arizona law does not deem a person with an interest in the litigation to be incompetent to testify. A.R.S. § 12-2201(B) ("A person shall not be incompetent to testify because he is a party to an action or proceeding or interested in the issue tried[.]" Second, this is not at all the usual situation underlying Arizona's policy in which a party has a contract with a witness to testify on its behalf and is directly paying that witness a contingent fee to

---

[2]

NEC secondarily argues that Howard should be excluded from testifying pursuant to Arizona Supreme Court's Rule of Professional Conduct 3.4(b), which prohibits a lawyer in part from "offer[ing] an inducement to a witness that is prohibited by law."  Even if the Court were to assume that such an ethical violation is occurring here, which the Court is not willing to do based on the record before it, the Court would not in any case conclude that excluding Howard's evidence on that basis alone would be the proper remedy.

testify.  While the Court understands that Howard is not a party plaintiff, his company is so closely allied with SUN regarding the issues presented in this action and he is so personally involved in this action that his testimony is more realistically compared to that of a party representative than that of a compensated independent witness. While it may be a close question, the Court concludes Howard's evidence should not be stricken because the issue here is more one of Howard's credibility as a witness rather than his competency as a witness.

Motions Related to NEC's Controverting Statement of Facts

SUN filed a 91-paragraph supplemental statement of facts in conjunction with its opposition to NEC's summary judgment motion.  NEC, in conjunction with its summary judgment reply, filed a 23-page controverting statement of facts for the purpose of disputing what it considers to be facts in SUN's statement of facts "that are irrelevant to the determination of the [summary judgment] motion, inaccurate characterizations of the record, or editorialization as to the application of facts in the record[;]" NEC appended some fifty pages of additional exhibits as support for its controverting statement of facts.  SUN has moved to strike NEC's controverting statement of facts and its additional exhibits on the ground that they are not authorized by LR 7.2(m)(1) or 56.1.  NEC's opposition to the motion to strike includes a motion for leave to file an amended, overlength summary judgment reply if the Court concludes that its controverting statement of facts should be stricken.

The Court will grant SUN's motion to strike NEC's Controverting Statement of Facts and its attached exhibits and will deny NEC's motion to file an amended, over-length reply, to which NEC has attached the same new exhibits it attached to its Controverting Statement of Facts. *See* Parker v. Arizona, 2013 WL 3286414, at *8 (D.Ariz. June 28, 2013) ("District courts in Arizona have uniformly held that the Local

Rules of Civil Procedure do not permit a party moving for summary judgment to file a supplemental statement of facts or attach[] exhibits with its reply."); B2B CFO Partners, LLC v. Kaufman, 856 F.Supp.2d 1084, 1086 (D.Ariz.2012) (Court concluded that LRCiv 56.1 "does not provide for a reply statement of facts or a response to the non-moving party's separate statement of facts."). Any objections that NEC desired to make regarding SUN's controverting and additional statements of facts should have been set forth in its reply memorandum and it did not need an overlength memorandum to do so.[3] See Gressett v. Central Arizona Water Conservation District, 2014 WL 4053404, at *2 (D.Ariz. Aug. 14, 2014) (Court noted that while a summary judgment movant may neither attach new evidence to its reply or file separate objections to the non-movant's controverting and additional statements of facts, "the movant may use its reply memorandum to respond to the non-movant's *objections* to the movant's supporting statement of facts.") (emphasis in original).

NEC's Motion for Summary Judgment

(1) Breach of Contract Claim

NEC argues that it is entitled to summary judgment on the SAC's breach of contract claim because the undisputed evidence establishes that it properly terminated the PPA because SUN did not timely secure construction financing for the solar power plant and did not timely commence construction of the plant.

Section 2.02 of the PPA, entitled "Certain Termination Rights Prior to Commercial Operation," granted both parties the right to terminate the PPA under

---

[3]    The Court, having reviewed the additional argument and evidence that NEC seeks to add to its reply memorandum, notes that even if the Court permitted it to be filed, none of it would in any case have affected the Court's resolution of NEC's summary judgment motion.

certain circumstances; § 2.02(a) set forth SUN's termination rights, and § 2.02(b) and § 2.02(c) set forth NEC's termination rights.  At issue here is § 2.02(b), which NEC relied on to terminate the PPA, which provides in its entirety: "In the event that Construction Financing has not been secured, and construction of the Generating Facility commenced, by July 31, 2011, Buyer [NEC] shall have the right to terminate this Agreement without payment or penalty by giving Notice to Seller [SUN], which Notice when given shall automatically terminate this Agreement."[4]

A. § 2.02(b)'s right of termination

A preliminary issue is whether § 2.02(b) permitted NEC to terminate the PPA solely because SUN failed to meet the July 31, 2011 deadline.[5] SUN argues that there is no independent significance to the July 31, 2011 benchmark date in § 2.02(b) for securing financing and commencing construction other than as it relates to the July 31, 2012 deadline for commercial operation of the solar plant. SUN's

---

[4]
Section 2.02(c) provided NEC with a separate termination circumstance: "In the event that Commercial Operation has not been achieved by July 31, 2012, Buyer shall have the right to terminate this Agreement without payment or penalty by giving Notice to Seller, which Notice when given shall automatically terminate this Agreement."

[5]
Although neither party has raised it as an issue, the Court notes that § 2.02(b) provides that NEC had the right to terminate the PPA in the event that construction financing had not been secured and construction commenced by July 31, 2011.   Since this termination right is phrased conjunctively rather than disjunctively, and in light of the lack of any evidence of a contrary intent in the record, the Court construes this conjunctive phrase as meaning that SUN had to fail to timely complete both tasks before NEC could terminate the PPA pursuant to § 2.02(b). *See* Bither v. Country Mutual Ins. Co., 245 P.3d 883, 885 (Ariz.App.2010) ("The word 'and' is a conjunction connecting words or phrases expressing the idea that the latter is to be added or taken along with the first.") (some internal quotation marks omitted.)

contention is that "the PPA only required SUN to complete construction of the contemplated power plant ... by July 31, 2012 and only required that SUN be far enough along by July 31, 2011 in terms of financing and construction to assure NEC that SUN would complete construction by the completion date."

The "[i]nterpretation of a contract is a question of law for the court where the terms of a contract are found to be plain and unambiguous. Whether a contract is ambiguous is a question of law; the mere fact that parties disagree as to its meaning does not establish an ambiguity." Chandler Medical Bldg. Partners v. Chandler Dental Group, 855 P.2d 787, 791 (Ariz.App.1993). The Court concludes that § 2.02(b) is unambiguous as a matter of law on the issue of NEC's right to terminate the PPA if SUN had not secured financing and had not commenced construction by July 31, 2011, and that this termination deadline constituted a material term of the PPA.[6] The contract language of § 2.02(b) is not reasonably susceptible to SUN's

---

[6]

SUN argues in its summary judgment response that the parties never discussed or negotiated § 2.02(b) and that the provision was inserted into the draft PPA by NEC's counsel at the last minute. To the extent that SUN is contending that it signed the PPA with no knowledge of the existence of § 2.02(b), the Court rejects that contention. There is no dispute that SUN left the final negotiation of the details of the PPA to its contract counsel, the law firm of Snell and Wilmer, and SUN has not submitted any evidence from its contract counsel to the effect that its counsel did not know about the existence of § 2.02(b). More importantly, Mark Moore, SUN's president and CEO who signed the PPA, testified at his deposition that he "did review the entire contract" before he signed it and that he did not recall having any specific reaction one way or the other to the language of § 2.02(b) before he signed the PPA. Moore also initialed the specific page of the PPA containing § 2.02(b), and did so right below where § 2.02(b) and § 2.02(c) were set forth.

Furthermore, whatever understandings SUN may have had stemming from earlier negotiations and drafts of the PPA did not survive the execution of the PPA inasmuch as § 10.17 of the PPA provides in part:

This Agreement ... constitutes the entire agreement between the Parties relating to the subject matter hereof. Upon each Party's execution of this Agreement, the Prior Understandings are hereby

- 8 -

1    asserted interpretation, which relies solely on the July 31, 2012 commercial

2    operation deadline § 2.02(c), because that interpretation ignores the clear language

3    of § 2.02(b) and would in effect make that language meaningless by improperly

4    reading it out of the PPA.[7] *See* Cardon v. Cotton Lane Holdings, Inc., 841 P.2d 198,

5    202 (Ariz.1992) ("A contract must be construed in its entirety and in such a way that

6    every part is given effect.")   The Court therefore declines to consider any parol

7    evidence submitted by SUN regarding the parties' alleged intent regarding this issue.

8    *See* Shattuck v. Precision-Toyota, Inc., 566 P.2d 1332, 1334 (Ariz.1977) ("Where the

9    intent of the parties is expressed in clear and unambiguous language, there is no

10    need or room for construction or interpretation and a court may not resort thereto.");

11    In re Estate of Lamparella, 109 P.3d 959, 963 (Ariz.App.2005) ("Language in a

12    contract is ambiguous only when it can reasonably be construed to have more than

13    one meaning. Although determination of the intent of contracting parties from

14    extrinsic evidence may require fact finding, whether contract language is reasonably

15    susceptible to more than one interpretation so that extrinsic evidence is even

---

> terminated and of no further force or effect.  This Agreement shall be considered for all purposes as prepared through the joint efforts of the Parties and shall not be construed against one Party or the other as a result of the preparation, substitution, submission or other event of negotiation, drafting or execution hereof.

This provision is underscored by the fact that at the very end of the PPA, below the parties' signatures executing the PPA, Mark Moore additionally signed a statement reading: "CONSENT TO TERMINATION OF PRIOR UNDERSTANDINGS." (Capitalization and underlining in original.)

[7]

     The Court agrees with NEC that a failure on SUN's part to meet the benchmark deadline of § 2.02(b) makes SUN's oft-repeated contention that the solar power plant would have been constructed and operational by the deadline set forth in § 2.02(c) irrelevant since the two provisions unambiguously give NEC distinct and separate termination rights.  The Court rejects SUN's argument that construing § 2.02(b) as a separate termination right renders § 2.02(c) a nullity.

admissible is a question of law for the court.") (internal citations omitted).

B. Securing of Construction Financing

NEC argues in part that summary judgment is appropriate in its favor because the evidence establishes that SUN failed to timely secure construction financing; SUN argues that summary judgment cannot be entered because it timely secured financing, and that even if it did not, summary judgment is still not appropriate because any failure to do so on its part was caused by NEC's failure to timely provide SUN with its necessary financial statements.

While § 2.02(b) provides that construction financing must be "secured" by July 31, 2011, the PPA does not define what constitutes the securing of construction financing other than to the extent that the PPA defines "Construction Financing" to mean "the initial financing, in whatever form(s), required to reasonably commence and pursue through completion (consistent with Prudent Practice) the construction of the Generating Facility, which financing may include, but is not limited to debt or equity finance, sponsor or developer contributions and secured and unsecured loans."   SUN contends that the requirement for securing construction financing means in the context of § 2.02(b) that it had to secure a lender who was prepared to make a loan to SUN for the construction of the solar plant, and that an unconditional commitment to lend was not necessary.   NEC contends that for purposes of § 2.02(b), financing is not secured until a lender has unconditionally bound itself to provide SUN financing.

"The controlling rule of [contract] interpretation requires that the ordinary meaning of language be given to words where circumstances do not show a different meaning applicable." Brady v. Black Mountain Inv. Co., 459 P.2d 712, 714 (Ariz.1969).   Since no evidence has been submitted that establishes that the

requirement that financing be "secured" has any trade meaning or industry usage or other special meaning, the Court, for purposes of the summary judgment motion, will construe the word "secured" in its normal, ordinary meaning, which in this context means "firmly established" and "sure; certain; assured[,]" *Webster's New Universal Unabridged Dictionary* (1996), and "capable of being expected or counted on with confidence[.]" *Webster's Third New International Dictionary of the English Language* (1961).

The following relevant evidence regarding the securing of financing is in the record; the Court considers this evidence to be either undisputed or at least not sufficiently controverted. DV, which was tasked with obtaining financing for SUN for the Hunt Valley solar plant project, sent a financing proposal to Matthew Wright at National Cooperative Bank ("NCB") on April 13, 2011, three and a half months before § 2.02(b)'s deadline. On July 22, 2011, Wright, a senior vice-president at NCB who was directly involved in reviewing SUN's financing request, sent DV a term sheet regarding the funding request. The first page of the term sheet stated that "[t]his is a term sheet outlining the salient terms of the credit facility and not the actual commitment to lend." The term sheet included terms for both a bridge loan of approximately $1.2 million, the purpose of which was "to bridge Federal 1603 Grants allowing for the construction" of the solar plant, and a separate permanent loan of approximately $2.5 million, the purpose of which was "[t]o provide term financing for the development" of the plant. The term sheet also stated that: "This proposal is subject to further due diligence by Lender. To indicate acceptance of these general terms, and to induce Lender to begin the formal underwriting process, please sign and return a copy of this proposal along with a deposit of $10,000. This deposit will be returned in the event that lender is unable to issue a formal

commitment for financing.  Note that the terms highlighted in this proposal are good for 30 days from the date of issuance."  The term sheet, in part, listed twenty "Conditions Precedent to Closing."[8]

On July 27, 2011, a DV representative sent Matthew Wright an email regarding the term sheet that requested: "Would you be able to put a period after 'credit facility' in the first paragraph and strike the reference that this is 'not an actual commitment to lend.'  We fully understand this is a term sheet and not an obligation or commitment to lend, but would prefer if that language could be removed or modified."  Wright sent DV the requested modification to the first page of the term

---

[8]

These twenty conditions precedent were:

An executed Power Purchase Agreement (PPA); An executed Site Lease Agreement; All necessary and relevant operating permits; A review of the executed Interconnection Agreement; Evidence of tax equity interest to fund; Appraisal of solar installation; Independent engineering report and other consultant reports as reasonably requested by lender, including Independent Engineer approval; Confirmation that project company has received clear title to any and all equipment from the installer; An approved project financial model, using a P90 solar resource production forecast, contractual revenue streams demonstrating debt service coverage of at least 1.10x after all operating and fixed expenses, and a P50 solar resource production forecast requirement of debt service coverage of at least 1.20x; Consents to collateral assignment with respect to material project documents; Customary legal opinions; Deeds of trust/mortgages plaintiff-relator fixture filings as appropriate; Receipt of Loan Documents; Payment of fees and expenses; Accuracy of reps and warranties; Loan documents, project documents and applicable permits in full force and effect; All documentation to be satisfactory to Lender in its sole discretion; Borrower will provide customary insurance coverage or caused to be provided for the project from a carrier acceptable to Lender; No material adverse change in the financial condition of the Borrower or Guarantor; Any other documents or information reasonably requested by lender.

sheet on July 29, 2011.  Wright testified that he did so because the modification was no going to add any risk to NCB because it was clear throughout the document that it was just a term sheet.

On September 15, 2011, six weeks after the expiration of the securing financing deadline of July 31, 2011, Matthew Wright sent DV's representative an email that stated in part:  "Also wanted to remind you that given your previous time constraints I sent out the term sheet without going through our formal credit committee vetting process. While I do not expect much to change I wanted to remind you that we still have to get some internal comments on the deal.  I am waiting for updated financials, projections and financials on the developers before bringing it to our credit group."  In response, DV's representative emailed Wright on that same day to state in part that DV "would like to target an October closing if possible." Wright  emailed a reply that same date that stated in part: "We could shoot for that. Once I bring this through the credit committee with the updated numbers I will send out a new term sheet.  Once we get that signed off on we can dual track the commitment with closing documents."

Matthew Wright testified that NCB's regular business practice was to issue a term sheet after it had completed a substantial portion of its underwriting with respect to the loan transaction.  He also testified that NCB and SUN had agreed to the overall financial structure of the loan transaction as reflected in the term sheet, that he was confident as of July 22, 2011, the date that NCB issued the term sheet, that NCB, barring any unforeseen circumstances, would have closed on SUN's financing request and funded the loan within two weeks to 30 days depending on how quickly NCB got the deliverables, *i.e.,* due diligence items, from SUN.  Wright further testified that he believed that as July 22, 2011, SUN had secured bridge loan

1   financing from NCB.

2       While Mark Moore, as president of SUN, signed the term sheet on July 25,

3   2011, there is no evidence that he returned it to NCB notwithstanding that NEC did

4   not send its PPA termination letter to SUN until August 4, 2011. Matthew Wright

5   testified that NCB never received the signed term sheet from either SUN or DV, and

6   that NCB never received the $10,000 good faith deposit from either SUN or DV.

7   Wright further testified that NCB would not undertake its underwriting steps

8   necessary to get to the loan commitment letter stage without the good faith deposit.

9       SUN argues that its evidence establishes that it had obtained a financing

10  proposal and a term sheet from NCB on July 22, 2011, and that NCB would have

11  promptly closed on the financing terms set forth in the term sheet had NEC not

12  terminated the PPA; SUN asserts that this term sheet was sufficient to establish that

13  it had timely secured financing.  NEC argues that SUN did not even meet its own

14  proposed definition of securing financing because it at best had achieved only

15  tentative and conditional steps to obtaining financing by the deadline.  While it is

16  questionable whether the above evidence by itself constitutes a sufficient basis for

17  a reasonable trier of fact to conclude that SUN had sufficiently secured financing by

18  the July 31, 2011 deadline regardless of how "secured" is defined, this issue cannot

19  be resolved separately from SUN's claim that NEC impeded SUN's ability to timely

20  secure financing.

21      This aspect of SUN's breach of contract claim is based on the general

22  principle that "[i]f one party to a contract prevents the other party from performing

23  one of the conditions to the contract, then he cannot use the failure to deny his own

24  obligation under the agreement." Fowler v. Dana, 436 P.2d 166, 167 (Ariz.App.

25  1968).  The record contains the following undisputed or insufficiently controverted

26

- 14 -

evidence submitted by SUN related to its contention that NEC's delay in providing SUN with its audited financial statements impeded SUN's ability to timely secure financing for the solar power plant project. James Howard of DV, who was responsible for obtaining financing for the project on SUN's behalf, testified that audited financials from NEC were absolutely critical because the banks' assessment of the creditworthiness of the project was dependent on NEC's ability to pay for the power and the renewable energy credits.  Mark Moore of SUN testified that he first requested NEC's audited financial statements on February 14, 2011 when he then informed NEC that SUN's lenders were requesting the information as part of SUN's movement toward closing on the financing for the project.  Moore further testified that despite NEC receiving a letter on February 25, 2011 from DV which further explained why SUN needed NEC's audited financial statements, David Plumb, NEC's CEO, repeatedly refused to provide the financial information to SUN. Plumb testified that although he could potentially have provided the requested financial information in less than a day, he initially refused to provide NEC's financial information for various reasons, which included that the PPA should have given sufficient information to SUN's lenders, that the PPA did not require NEC to provide SUN with its audited financial statements, that NEC was not in the habit of providing audited financials on just any request, and that SUN could obtain the necessary NEC documents from the Arizona Corporation Commission.  Moore testified that SUN made repeated attempts to obtain the financial information from NEC and that NEC did not provide its financial information until May 18, 2011, more than three months after SUN's first request.

Matthew Wright of NCB testified that it is essential and consistent with industry custom and practice for a lender to require a utility's audited financial statements

before making a financing offer such as the one NCB made to SUN, that the utility's delay in providing audited financial statements will delay the lender's decision to issue a financing offer, that NCB was not prepared to make a financing proposal to SUN without NEC's audited financials, which NCB did not receive until May 19, 2011, and that it was quite possible that the bank would have been in a position to issue its financing proposal, which it did not send to SUN until July 22, 2011, sooner had it received NEC's audited financial statements months earlier.

The Court agrees with SUN that the evidence it submitted, together with the justifiable inferences from that evidence, all viewed in SUN's favor, constitutes significant probative evidence creating a genuine dispute of material fact as to whether NEC improperly interfered with SUN's efforts to timely secure construction financing.  Because the Court cannot conclude as a matter of law that NEC did not breach the PPA by terminating it pursuant to § 2.02(b) in part based on its belief that SUN had not timely secured construction financing, NEC is not entitled to entry of summary judgment in its favor on the breach of contract claim.

C. Commencement of Construction

Pursuant to § 2.02(b), SUN also had to commence construction of the Generating Facility by July 31, 2011.[9]   NEC, which asserts that "vertical" construction of the generating facility had to have been commenced by the July 31, 2011 deadline, argues that the Court can conclude as a matter of law based on the

---

[9]

Article One of the PPA defined "Generating Facility" in relevant part as meaning SUN's "electric generating facility that qualifies as an Eligible Renewable Energy Resource, with a nameplate equal to the Capacity, ... together with all materials, equipment systems, structures, features and improvements, additions, modifications or expansions as determined in [SUN's] discretion and necessary to produce electric energy at such facility, excluding land rights and interests in land."

undisputed evidence that SUN had not actually commenced construction by the deadline.  SUN asserts that the PPA does not require the commencement of vertical construction by the deadline and that it sufficiently commenced construction to meet the deadline.  Since the PPA does not define the term "commenced" for purposes of § 2.02(b) and since there is no evidence in the record that establishes that the term has any special trade meaning or industry usage, the Court will construe the word "commenced" in its normal, ordinary meaning, which in this context means "to begin" or "to start."

The following relevant evidence concerning SUN's commencement of construction is in the record; the Court considers this evidence to be undisputed for purposes of the summary judgment motion.  On March 7, 2011, DV asked Sundt, Inc., a large construction company, to prepare a construction proposal on SUN's behalf for its Hunt Valley solar power plant.  Chad Buck, then a senior estimator at Sundt, provided a construction proposal to DV on March 24, 2011 based on a conceptual design of the plant provided by DV; the proposal estimated the cost to construct the plant and the time it would take to complete physical construction of the plant, which Buck estimated to be approximately two months to three months depending on the construction alternative to be selected.  SUN secured two construction-site surveys in April 2011, which did not include the placement of a future roadway that needed to be built on the site property, and on April 20, 2011, SUN closed escrow on the lease option for the property on which the plant was to be built.

Mark Moore, SUN's CEO, testified that on July 31, 2011, the construction commencement deadline, SUN conducted a ground breaking ceremony on the site property which consisted solely of Moore, a SUN consultant, and the landowner

installing a sign, made from two 4x4 posts and a piece of plywood with SUN's logo on it, on the site property by digging holes and pouring cement for the sign posts. Moore, at some unspecified date, also had 32 linear feet of chain link fence installed to delineate a single corner of the site property, which consisted of the placement of sixteen feet of fencing on either side of the corner. Moore also testified that to his knowledge no other construction-related activity had been done at the site prior to August 4, 2011, the date NEC terminated the PPA.

Chad Buck of Sundt testified that Sundt had never reached a construction contract with either SUN or DV, that Sundt would have insisted on a written contract before it commenced work, and that Sundt would not go on a job site and move dirt or start to retain subcontractors and order supplies without a written construction contract. Buck also testified that Sundt does not start the build part of a design build project until the design is far enough along for it to know what it was building, and that he agreed that the SUN project never got out of the box in terms of design, let alone getting specific enough for him to know what Sundt was going to build. He further testified that the SUN project had never advanced far enough for Sundt to apply for any permits, such as a permit for clearing and grubbing the building site because the project design was not even far enough along for Sundt to know what to clear and grub. He also testified that Sundt had no formal design for the project, but had developed its anticipated layout and had based its pricing off of that. He finally testified that Sundt had not commenced construction on the SUN project as of July 31, 2011.

NEC's termination letter, dated August 4, 2011, stated in part regarding the commencement of construction requirement that a NEC representative visited the site on August 1, 2011 and found no evidence that there had been construction

mobilization or construction activity related to the solar power plant and that pictures taken during the site visit showed no ground disturbance or construction vehicles on site.

The termination letter further stated in part that if SUN provided sufficient documentation to NEC by August 19, 2011 that construction had been timely commenced then NEC would rescind the termination letter.  In response thereto, on August 22, 2011, SUN sent NEC a letter stating that the construction proposal that Sundt sent to SUN met the specified terms of the PPA and that a draft contract had also been delivered.  The copy of the draft contract attached to the letter was  simply a standard model form construction contract in which all of the blank spaces where relevant project-specific information were to be filled in were left blank.

The Court, having viewed the evidence of record and the justifiable inferences from that evidence in SUN's favor, concludes that there is no triable issue of fact as to this portion of SUN's breach of contract claim because a fair-minded trier of fact could not conclude that SUN had timely commenced construction of the solar power plant under any reasonable definition of the word "commenced."   The mere installation of a corporate sign and the installation of 32 feet of fencing on one corner of the site where the plant was to be constructed simply cannot be reasonably considered to constitute anything more that a scintilla of evidence that is insufficient to show that construction had been commenced, particularly in light of SUN's failure to submit any significant probative evidence establishing either that it had negotiated a construction contract with Sundt or that it had provided Sundt with a completed design for the plant before the termination deadline.[10]  While there is no dispute that

---

[10]

To the extent that SUN is in any way contending in its response to the summary judgment motion that NEC's three-month delay in providing its audited

- 19 -

SUN had timely concluded a lease for the plant site, that does not create a genuine issue of material fact regarding the commencement of construction because the PPA's definition of "Generating Facility" specifically excludes "land rights and interests in land."   SUN has, at best, shown only that it had begun some preparations for the commencement of construction prior to the July 31, 2011 deadline, not that it had actually started the construction of the plant.

(2) Breach of the Implied Covenant of Good Faith and Fair Dealing Claim

NEC also argues that it is entitled to summary judgment on SUN's claim that NEC's termination of the PPA violated the contract's implied covenant of good faith and fair dealing.  SUN argues in its summary judgment response that NEC violated the implied covenant in two ways, one of which is that  NEC terminated the PPA for a reason beyond the risks assumed by SUN. The Court concludes that SUN has not raised a triable issue of fact as to this aspect of the breach of its implied covenant claim.

Arizona law implies a covenant of good faith and fair dealing in every contract. Wells Fargo Bank  v. Arizona Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund, 38 P.3d 12, 28 (Ariz.2002), and the breach of the implied covenant may provide the basis for imposing contract damages. *Id.* at 29; United Dairymen of Arizona v. Schugg, 128 P.3d 756, 760 (Ariz.App.2006).  The duty to act in good faith does not "alter the specific obligations of the parties under the contract"

---

financial statements to SUN prevented SUN from timely commencing construction of the solar power plant, the Court rejects that contention.  There is nothing in SUN's statements of facts that establishes that construction would have commenced earlier but for the delay in obtaining NEC's financial statements, and SUN's response does not contain any cogent argument raising such an issue (as opposed to the issue that the delay in obtaining NEC's financial information delayed the securing of financing for the project).

and "[a]cts in accordance with the terms of one's contract cannot *without more* be equated with bad faith." <u>Wells Fargo Bank</u>, at 30 (emphasis in original).  The necessary something "more" may arise if one party exercises discretion retained under a contract "in such a way as to deny the other a reasonably expected benefit of the bargain." *Id.*

SUN's contention is that NEC's termination of the PPA pursuant to § 2.02(b) constitutes a violation of the implied covenant because the risk SUN assumed under the PPA was that NEC could terminate the contract only if the plant was not commercially operational by July 31, 2012 as required by § 2.02(c).  The Court concludes that this argument has no merit because SUN, as a matter of law, expressly assumed the risk of a § 2.02(b) termination by executing the PPA.  As the Court has already noted, § 2.02(b) and § 2.02(c) unambiguously provided NEC with distinct and separate termination rights, and because SUN has not established the existence of any disputed issue of material fact concerning its failure to timely commence construction of the plant, SUN had no justifiable expectation that a termination pursuant to § 2.02(b) could not be partially based on such a failure on its part.

SUN argues that NEC also violated the implied covenant by failing to cooperate with SUN's efforts to timely obtain construction financing and that § 2.02(b) does not constitute an agreement on its part that NEC could terminate the PPA for delays that NEC caused.

Arizona law recognizes that a party to a contract "may not exercise a retained contractual power in bad faith."  <u>Wells Fargo Bank</u>, 38 P.3d at 30. *See also*, Restatement (Second) of Contracts § 205, cmt d. (noting that for purposes of the obligation of good faith and fair dealing, bad faith may be overt or may consist of

1  inaction and that interference with or failure to cooperate in the other party's

2  performance has been recognized by the courts as a type of bad faith.)

3  Based on the evidence already set forth, the Court concludes that SUN has

4  established the existence of a genuine dispute of material fact as to whether NEC

5  breach the implied covenant of good faith and fair dealing by improperly interfering

6  with Sun's efforts to timely secure construction financing.  Therefore,

7  IT IS ORDERED that defendant Navopache Electric Cooperative, Inc.'s

8  Motion to Exclude James Dudley Howard, Jr. as a Witness (Doc. 71) is denied.

9  IT IS FURTHER ORDERED that plaintiff Solar Utilities Network. LLC's Motion

10  to Strike Defendant Navopache Electric Cooperative, Inc.'s Improper Controverting

11  Statement to Sun's Supplemental Statement of Facts (Doc. 85) is granted and that

12  defendant Navopache Electric Cooperative, Inc.'s Controverting Statement to SUN's

13  Supplemental Statement of Facts (Doc. 84), and Exhibits A, B, C, D, E, F, and G

14  attached thereto (Doc. 84-1) are stricken from the record.

15  IT IS FURTHER ORDERED that defendant Navopache Electric Cooperative,

16  Inc.'s Alternative Motion for Leave to File Amended Reply (Doc. 86) is denied.

17  IT IS FURTHER ORDERED that defendant Navopache Electric Cooperative,

18  Inc.'s Motion for Summary Judgment Pursuant to Rule 56 (Doc. 72) is denied. The

19  Court, however, finds pursuant to Fed.R.Civ.P. 56(g) that the following material facts

20  are not genuinely in dispute and are to be treated as established in this case for trial

21  purposes: (1) that plaintiff Solar Utilities Network, LLC did not timely commence

22  construction of the Generating Facility for purposes of § 2.02(b) of the parties' Solar

23  Energy Power Purchase Agreement;  and (2) that a termination of the contract

24  pursuant to § 2.02(b) by defendant Navopache Electric Cooperative, Inc., regardless

25  of whether the deadline of § 2.02(c) for the commencement of the commercial

26

operation of the Generating Facility could have been met, was a risk that plaintiff Solar Utilities Network, LLC expressly assumed by executing the parties' Solar Energy Power Purchase Agreement

IT IS FURTHER ORDERED that a separate order will be entered in due course setting deadlines for filing the Joint Pretrial Statement and trial-related documents, and setting dates for holding the Joint Pretrial Conference and commencing the trial.

DATED this 29th day of September, 2015.


Paul G. Rosenblatt
United States District Judge